FILED

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA 98 MAR 24  PM 3: 11
SOUTHERN DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

VEOCIE RADCLIFF,　　　　　　　　}
　　　　　　　　　　　　　　　　}
　　　　Plaintiff,　　　　　　　}
　　　　　　　　　　　　　　　　}
v.　　　　　　　　　　　　　　　}　　　　CASE NO. CV 96-B-2173-S
　　　　　　　　　　　　　　　　}
BEVERLY HEALTH CARE　　　　　　}
CENTER WEST,　　　　　　　　　　}　　　　**ENTERED**
　　　　　　　　　　　　　　　　}
　　　　Defendant.　　　　　　　}　　　　MAR 2 4 1998

## MEMORANDUM OPINION

This action is before the court on the Motion for Summary Judgment filed by defendant

Beverly Enterprises, Inc. d/b/a Beverly Health Care Center West ("Beverly West").  Plaintiff

Veocie Radcliff ("Radcliff") brought this action alleging violations of her rights under

42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.

§§ 2000e-2(a), 2000e-3(a).  Radcliff claims that Beverly West: (1) racially discriminated

against her by removing her from payroll and paying her as an independent contractor (or

vendor) instead; (2) racially discriminated against her by delaying or withholding her

paychecks; and (3) retaliated against her for filing an EEOC charge by delaying or withholding

her paychecks. (Compl. at ¶¶ 7-8.)[1]  Upon consideration of the record, the submissions of the

---

[1]　Radcliff also alleges that Beverly West changed her to independent contractor status in
August 1993 as retaliation for having previously complained of race discrimination.  (*See* Compl.
at ¶ 7.)  Radcliff has not set forth any arguments or evidence to support such a claim.  Radcliff
has admitted that she never complained of race discrimination to anyone at Beverly West, and
her counsel subsequently stated, on the record, that Radcliff would only pursue a racial
discrimination claim with respect to the independent contractor status.  (Radcliff Dep. at 169-70.)
Therefore, the court need not address this second retaliation claim.

parties, the argument of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment is due to be granted and Radcliff's claims are due to be dismissed with prejudice.

## I. FACTUAL BACKGROUND[2]

In February 1991, Veocie Radcliff, an African American, began working as a beautician at Beverly West, a skilled nursing facility in Birmingham, Alabama owned by Beverly Enterprises, Inc. (Radcliff Dep. at 23; Malone Decl. I at ¶ 2.) From February 27, 1991 until August 12, 1993, Beverly West's bookkeeping department paid Radcliff through payroll for the services that she provided to the facility's residents. (Isom Decl. I at ¶ 4, Ex. A.) During this period, Radcliff received a paycheck for her services every two weeks. (Radcliff Dep. at 40.)

In August 1993, Beverly Enterprises' regional office directed its two area managers in Alabama, Nella Gossett and Gregg Waycaster, to pay all beauticians as independent contractors (or vendors) rather than through payroll. (Malone Decl. I at ¶¶ 3-7; Gossett Decl. at ¶ 3; Waycaster Decl. at ¶ 3.) The regional office made this request to ensure that beauticians could not complain about potential wage and hour law violations, especially overtime requirements. (Malone Decl. I at ¶¶ 5, 6.) Area manager Nella Gossett was responsible for an area of the state encompassing ten facilities, including Beverly West. (Gossett Decl. at ¶ 2.) Upon receiving the directive from the regional office, Gossett

---

[2]     When considering a motion for summary judgment, the court views the evidence in the light most favorable to the party opposing the motion. *See Merritt v. Dillard Paper* Co., 120 F.3d 1181, 1182 (11th Cir. 1997). All reasonable factual inferences have been drawn in the nonmovant's favor. *See Spence v. Zimmerman,* 873 F.2d 256, 257 (11th Cir. 1989).

instructed the administrators in charge of her ten facilities to remove their beauticians from payroll and pay them instead as independent contractors. (*Id.* at ¶¶ 3-4; Malone Decl. I at ¶ 7; Johnston Decl. at ¶¶ 2-3.) Since August 1993, 32 of the 33 beauticians who have worked at facilities under Gossett's charge, including 24 of the 25 beauticians identified as "white," have been paid as independent contractors. (Malone Decl. II at ¶ 5, Ex. C.)

The lone exception was Kathy Peters, a white beautician who worked at the Florence Comprehensive Care Center ("Florence" or "FCCC"). From April 6, 1989 until July 15, 1993, Peters was paid as an independent contractor. (*Id.* at Ex. A; Isom Decl. II at ¶ 8, Ex. A.) In July 1993, FCCC office manager Sandy George placed Peters on payroll at Peters's request and without conferring with facility administrator Bill Birmingham. (Isom Decl. II at ¶ 8, Ex. A; Ford Decl. at ¶¶ 2-4; George Decl. at ¶¶ 2-3.) Birmingham was aware of the directive to pay beauticians as independent contractors, but he did not relay this directive to his employees because he believed that the facility beautician (Peters) was already being paid as an independent contractor. (Birmingham Decl. at ¶¶ 3-4.) Consequently, the office manager who directed Peters to be placed on payroll did not realize that such an action was inconsistent with company policy. (George Decl. ¶¶ 2-3; Lee Decl. ¶ 4.) Peters remained on payroll until May 1994, when a representative from Beverly Enterprises' corporate office discovered how she was being paid. (Ford Decl. at ¶ 8; George Decl. at ¶ 4; Lee Decl. at ¶ 5.) Peters was removed from payroll on May 5, 1994, and she has been paid as an independent contractor since that time. (Lee Decl. at ¶ 5; Croft Decl. II at ¶ 5,8, Ex. A.) There is no evidence that either Gossett or the regional office was aware prior to May 1994 that Peters was being paid through payroll. (*See* Gossett Decl. at ¶ 4; Malone Decl. I at ¶ 7.)

-3-

At Beverly West, Gossett issued her instructions to remove beauticians from payroll to Jack Holloway and Grace Delaney, the facility's administrator and office manager, respectively. (Holloway Dep. at 26-27; Gossett Decl. at ¶ 4; Radcliff Dep. at 160-61.) Both Delaney and Holloway informed Radcliff that she was being removed from payroll. (Radcliff Dep. at 35, 148, 154.) Radcliff was instructed to continue submitting her invoices and told that she would be paid as an independent contractor. (Holloway Dep. at 20-21, 54-55.)

Radcliff received a paycheck every two weeks as a payroll employee. (Radcliff Dep. at 40; Holloway Dep. at 54.) Once she became an independent contractor, Radcliff submitted her payment invoices to Beverly West which, in turn, submitted the invoices to Beverly Enterprises' accounts payable department at Fort Smith, Arkansas. (Croft Decl. I at ¶¶ 1, 7-9.) Beverly West maintains that its method of processing Radcliff's invoices was no different from the method used to process other independent contractors' invoices. (*Id.* at ¶¶ 9, 11; Carter Decl. at ¶ 7; Holloway Dep. at 152-53.) Radcliff admits that she is unaware of any differences in the method used to handle her invoices as compared to other vendors; thus she cannot dispute whether the alleged delays in her payments occurred at Fort Smith, Arkansas. (Radcliff Dep. at 171-72, 182-85.) Radcliff concedes that from August 1993 through December 1993, the transmission time of her invoices[3] from Beverly West to accounts payable in Arkansas was no different than the transmission time of other vendors. (Carter Decl. at ¶¶ 5, 7, Ex. A; Radcliff Dep. at 171-72, 180.)

---

[3] The average time, from date of invoice to date of transmission, for Radcliff was about seven days. (Carter Decl. at Ex. A.)

-4-

For new vendors, there is a start-up delay of approximately five weeks from the date the first invoice was submitted until the date a check was disbursed by accounts payable. (Croft Decl. I at ¶¶ 6-7.) After this start-up period, the payment cycle is approximately 45 days. (*Id.* at ¶ 7.) Radcliff submitted her first invoice as an independent contractor on August 13, 1993. (*Id.* at ¶¶ 3,6, Ex. A.) Approximately five weeks later, Radcliff received her first payment as an independent contractor; the corporate accounts payable department had issued the check on September 23, 1993. (*Id.* at ¶¶ 3, 4, 6, Exs. A, B; Radcliff Dep. at 171, 181.) Radcliff subsequently received up to five checks every month in payment of invoices she had submitted up to five weeks earlier. (Croft Decl. I at ¶ 7, Exs. A, B; Radcliff Dep. at 182, 195-96, Ex. 15.)

After Radcliff's invoices were transmitted to accounts payable, no one at Beverly West had any control over the amount of time it took to pay those invoices. (Holloway Decl. at ¶ 4; *see also* Radcliff Dep. at 145-46.) At the Fort Smith facilities, it took approximately two weeks to route invoices to accounts payable and enter them in the company's purchase journal. (Croft Decl. I at ¶ 9, Ex. A.) From that point, an additional three weeks or more could be required before a check was issued for Radcliff's invoices. (*Id.*) From August 1993 through March 1994, it took the accounts payable department an average of 23 days from the date of transmission to issue checks for Radcliff's invoices. (*Id.* at ¶ 2, Ex. B; Carter Decl. ¶ 5, Ex. A.) The check would then be mailed to Beverly West for distribution to Radcliff. (Holloway Dep. at 130-31; Carter Decl. at ¶ 6.) During this same time frame, Radcliff's checks cleared, on average, eleven days after issuance. (Croft Decl. I at Ex. B.) Beginning with Radcliff's initial invoice as an independent contractor, her invoices were routed along this path.

-5-

(Holloway Decl. at ¶ 3; Croft Decl. I at ¶¶ 6-9, Exhibit A.)

Beverly Enterprises' other area manager in Alabama, Gregg Waycaster, did not adhere to the corporate directive to pay beauticians as independent contractors. (*See* Waycaster Decl. at ¶¶ 3-6.) Instead, with Waycaster's apparent knowledge, several administrators under his charge elected to continue paying their beauticians through payroll. (*Id.*) According to Radcliff, she learned that two white beauticians, Joanne Smith at Beverly Health Care Center East and Jewel Mullins Corey at Pleasant Grover Health Care Center, were still being paid through payroll after all beauticians were supposedly moved to independent contractor status. (Radcliff Dep. at 35-36.) Unlike Radcliff, who worked for a facility under Gossett's supervision, both Smith and Corey worked for facilities under Waycaster's charge. (*Id.*; Waycaster Decl. at ¶ 2.) After learning about Smith and Corey's payroll status, Radcliff filed a charge with the EEOC on September 2, 1993, alleging that she had been removed from payroll as a result of racial discrimination. (Radcliff Dep. at 135, Ex. 11.)

Radcliff admits that she did not tell anybody at Beverly West about filing the charge; at the time, she told office manager Delaney that she was "going to seek some legal help, some legal advice." (*Id.* at 173.) Holloway did not learn about the charge until he received the charge from the EEOC. (Pl.'s Evid. Submission at Ex. 3 at 3 (Def.'s Resp. to Pl.'s 2d Req. for Produc. of Docs. & Interrogs); Holloway Decl. at ¶ 7.) Virginia Carter, who handled Radcliff's invoices at Beverly West, was not aware of the charge. (Carter Decl. at ¶ 8.) On September 24, 1993, Holloway forwarded the charge to Beverly Enterprises' human resources department which, in turn, forwarded it to the legal department. (Pl.'s Evid. Submission at Ex. 8 at 3.) According to the defendant, no one in Beverly Enterprises' corporate accounts

-6-

payable department was informed of Radcliff's September 2, 1993 charge or her race. (*Id.*; Croft Decl. I at ¶ 10.) Radcliff knows of no one involved with the issuing of checks at Beverly Enterprises who knew of her charge. (Radcliff Dep. at 183-84.)

When Radcliff complained about delays in her payments, Holloway checked with Carter to ensure that Radcliff's invoices were transmitted to Fort Smith in a timely fashion. (Holloway Decl. at ¶ 5; Carter Decl. at ¶ 3.) Carter contacted the accounts payable department twice a month to ascertain the status of Radcliff's invoices. (Carter Decl. at ¶ 3.) Additionally, Holloway and area manager Gossett offered to pay Radcliff a fixed amount each month based on her average monthly profits, and periodically reconcile any differences between the fixed payments and Radcliff's actual income. (Holloway Decl. at ¶ 6; Gossett Decl. at ¶ 5; Radcliff Dep. at 216-17.) Radcliff refused this offer. (Holloway Decl. at ¶ 6; Gossett Decl. at ¶ 5; Radcliff Dep. at 216-17.)

On December 6, 1993, Radcliff filed an amendment to her EEOC charge, stating claims of racial discrimination and retaliation for filing her previous charge. (Radcliff Dep. at Ex. 13.) In its Determination, the EEOC concluded that "there is reasonable cause" to believe that Radcliff was the victim of racial discrimination and had been retaliated against for filing her EEOC charge. (Pl.'s Evid. Submission at Ex. 1 (EEOC Determination at 2 (Feb. 26, 1996).) On August 20, 1996, Radcliff filed her Complaint in the present action. At present, Radcliff continues to work at Beverly West as an independent contractor beautician. (Radcliff Dep. at 21.)

-7-

## II. STANDARD OF REVIEW

Summary judgment is proper under FED. R. CIV. P. 56(c) "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986). The movant can meet this burden by presenting evidence that there is no dispute of

material fact or the nonmoving party has failed to present evidence in support of some element

of her case on which she bears the ultimate burden of proof. *Id*. at 322-23. Once the moving

party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings

and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on

file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324

(quoting FED. R. CIV. P. Rule 56(e)). Rule 56(c) mandates the entry of summary judgment

against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial. *Id*.

at 322. To avoid an adverse ruling on a motion for summary judgment, the nonmoving party

must identify "a substantial conflict in evidence to support a jury question." *Combs v.*

*Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997), *cert. denied*, __ U.S. __, 118 S.

Ct. 685 (1998) (quoting *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989)).

In deciding a motion for summary judgement, the judge's function is not to "weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Credibility

determinations, the weighing of evidence, and the drawing of inferences from the facts are the

-8-

function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III. DISCUSSION

In the present action, the court's analysis is governed by the familiar, tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981).[4] Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Burdine*, 450 U.S. at 252-53. If the plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant "to articulate a legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant succeeds in carrying this burden, then the plaintiff must prove that the defendant's articulated reasons are a mere pretext for unlawful motives (i.e., race discrimination or retaliation). *Burdine*, 450 U.S. at 253. A plaintiff's prima facie case coupled with sufficient evidence to allow a factfinder to disbelieve the employer's proffered explanation for its actions is enough to preclude entry of judgment as a matter of law. *See Combs*, 106 F.3d at 1529; *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207 (11th Cir. 1997). At

---

[4]     Although the statutory language and remedies of 42 U.S.C. § 1981 are distinct from Title VII, the allocation of the burdens of proof and the analysis for determining whether a defendant employer unlawfully discriminated against an employee are the same. *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994). This Memorandum Opinion's discussion of Radcliff's claims under Title VII is equally applicable to the plaintiff's claims under § 1981.

all times, the plaintiff bears the burden of persuasion on the ultimate question of whether the defendant acted with an unlawful motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

## A.    Race Discrimination

Radcliff states two separate claims of race discrimination. First, she claims that Beverly West removed her from payroll and changed her to independent contractor status in August 1993 because of her race. Second, she alleges that Beverly West discriminated against her by delaying or withholding her payments after August 1993. To establish a prima facie case of race discrimination, Radcliff must prove that: (1) she is a member of a protected class; (2) she was qualified for the position that she held; (3) she experienced an adverse employment action; and (4) a similarly situated person outside of the protected class was treated more favorably. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). Because Radcliff has failed to provide sufficient evidence to meet her prima facie requirements for either of her race discrimination claims, summary judgment is appropriate for both claims.

### 1.    *Payroll Status*

With respect to her claim concerning her August 1993 change from payroll to independent contractor status, the court assumes that Radcliff can establish the first three elements of the prima facie case. Radcliff's claim is due to be dismissed on summary judgment because Radcliff has not produced any evidence of similarly situated employees outside her protected class who have enjoyed more favorable treatment.

A comparison of the employer's treatment of the plaintiff with that of similarly situated, non-protected employees is an essential part of the disparate treatment inquiry, and

purported comparators must be similarly situated to the plaintiff in every material respect. *Id.*
To be "similarly situated," the individuals with whom the plaintiff seeks to compare her
treatment must have dealt with the same supervisor and been subject to the same standards.
*See Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989); *see also Mitchell v. Toledo
Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). The plaintiff has the burden of proving the
similarity between herself and the alleged comparators. *See Gerwens*, 874 F.2d at 1541. In
the present case, Radcliff identifies two white beauticians, Joanne Smith and Jewel Mullins
Corey, who were treated dissimilarly from herself. However, Smith and Corey worked in
facilities managed by Gregg Waycaster. (Waycaster Decl. at ¶ 2; Radcliff Dep. at 35-36, 164-
66.) Because Radcliff's area manager, Nella Gossett, made managerial decisions independent
of Waycaster, a factfinder cannot reasonably conclude that Radcliff, Smith and Corey are
similarly situated. *See Jones v. Frank*, 973 F.2d 673, 676 (8th Cir. 1992); *Mitchell*, 964 F.2d
at 583. Therefore, the payroll status of Corey and Smith does not support Radcliff's claim of
disparate treatment.

   With respect to those beauticians who were similarly situated with Radcliff (i.e., those
under Gossett's charge), Radcliff has not provided any evidence of beauticians outside her
protected class who were treated more favorably. In fact, Beverly West has submitted
exhaustive evidence of how the corporate directive to pay beauticians as independent
contractors was applied without respect to the beautician's race. Gossett relayed the corporate
directive to her area facilities in August 1993. (Gossett Decl. at ¶¶ 3-4.) At the time, eleven
beauticians, including Radcliff, worked at facilities under Gossett. (Malone Decl. II at ¶ 5,
Exhibit C.) Of these eleven, ten are identified as "white" and only Radcliff is identified as

-11-

"black." (*Id.*) Only Kathy Peters, a white beautician at the Florence facility, was not paid as an independent contractor after August 1993. (*Id.*)[5] However, Peters's payroll status hardly provides evidence of discriminatory treatment.[6] Her "favorable treatment" was the result of an independent decision by FCCC office manager Sandy George. George was only the office manager at FCCC and did not know Radcliff or her race. (George Decl. at ¶¶ 1, 5.) Additionally, Bill Birmingham, the FCCC facility administrator, reasonably believed that Peters was already an independent contractor. (Birmingham Decl. at ¶ 4.) Birmingham has never met Radcliff or known her race. (*Id.* at ¶ 5.) Given this undisputed context, Peters's payroll status cannot reasonably serve as evidence supporting Radcliff's prima facie case. The plaintiff's burden at the prima facie stage is not "onerous." *Burdine*, 450 U.S. at 253-54. Nevertheless, the evidence presented at this stage must be "sufficient to create an inference of discrimination." *Holifield*, 115 F.3d at 1564 (citing *Shah v. General Elec. Co.*, 816 F.2d 264, 268 (6th Cir. 1987)). Radcliff has failed to present evidence that could create such an inference.

---

[5] In August 1993, Peters and Radcliff were the only beauticians being paid through payroll. At the time, Radcliff was the only beautician under Gossett's charge who had never been paid before as an independent contractor. *Id.*

[6] As stated in the Factual Background, Peters had been paid as an independent contractor from April 6, 1989 until July 15, 1993 when she was placed on payroll at her request by the FCCC office manager. (*Id.*; Isom Decl. II at ¶ 8, Ex. A; Ford Decl. at ¶¶ 2-4; George Decl. at ¶¶ 2-3.) Because the FCCC administrator who received Gossett's directive thought Peters was already an independent contractor and because the FCCC office manager was unaware of Gossett's directive, Peters remained on payroll. (Birmingham Decl. at ¶¶ 3-4; George Decl. ¶¶ 2-3; Lee Decl. ¶ 4.) Peters was immediately taken off payroll in May 1994, when the Beverly Enterprises corporate office discovered this oversight. (Ford Decl. at ¶ 8; George Decl. at ¶ 4; Lee Decl. at ¶ 5.) She has been paid as an independent contractor ever since. (Lee Decl. at ¶ 5; Croft Decl. II at ¶ 5,8, Ex. A.)

Even if Radcliff could establish a prima facie case, her claim would ultimately fail. Under the *McDonnell Douglas* framework, Beverly West must articulate a legitimate nondiscriminatory reason for any disparities in the treatment of Radcliff. *See Burdine*, 450 U.S. at 254-55. In the present case, Beverly West first alleges that Radcliff's change to independent contractor status was the result of the regional office's decision to change all beauticians to independent contractor status. (Malone Decl. I at ¶¶ 3-6.) This decision was ostensibly motivated by a desire to avoid wage and hour law requirements. (*See id.*) Beverly West explains that implementation of this decision in Alabama was not uniform because Nella Gossett instructed all facilities under her charge to comply with the regional office's decision while Greg Waycaster apparently did not issue a comparable directive to his facilities. (*Compare* Gossett Decl. at ¶¶3, 4; *with* Waycaster Decl. at ¶¶ 3-6.) Second, Beverly West asserts that Kathy Peters remained on payroll only because of errors and oversight by FCCC administrator Birmingham and FCCC office manager George. Because Beverly West has met its burden by articulating these two, legitimate, nondiscriminatory reasons, Radcliff must prove that the proffered reasons are merely pretext for intentional discrimination. *See Burdine*, 450 U.S. at 255-56.

In determining whether a plaintiff has provided evidence of pretext, the court's inquiry focuses on the veracity — not wisdom — of the defendant's proffered rationale; employment decisions based on erroneous assumptions are not outlawed by Title VII. *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984). In the present case, Radcliff does not challenge the wage and hour law concerns of Beverly West. Furthermore, it is undisputed that both Birmingham and George, who were collectively responsible for

-13-

Peters's payroll status, have never met Radcliff and were not aware of Radcliff's race.
(George Decl. at ¶ 5; Birmingham Decl. at ¶ 5.)  George was also unaware of Gossett's
instruction to move all beauticians off payroll.  (*See* George Decl. at ¶ 5.)

   Instead of directly challenging Beverly West's proffered reasons, Radcliff argues that
the EEOC's Determination and the "internal contradiction" of Beverly West's explanation
provide sufficient evidence of pretext.  (*See* Pl.'s Br. at 11-13.)  Inconsistencies or
contradictions in a defendant's proffered explanation may undermine the credibility of such an
explanation and raise an issue of fact as to pretext.  *See Sheridan v. E.I. DuPont de Nemours
& Co.*, 100 F.3d 1061, 1072 (3rd Cir. 1996), *cert. denied*, __ U.S. __, 117 S. Ct. 2532
(1997).  In the present case, Radcliff argues that an "internal contradiction" exists in Beverly
West's explanation because Beverly West had originally stated that the decision to change
beauticians to independent contractor status was "company wide" and Beverly West now claims
the decision is only "regional policy."  (*See* Pl.'s Br. at 13; *compare* Pl.'s Evid. Submission at
Ex. 1 (Oct. 8, 1993 letter from Lisa Jones of Beverly West's human resources department),
*with* Malone Decl. I at ¶¶ 3-6.)  While Beverly West does not deny these allegations, this
discrepancy is hardly material.  Given the evidence, the only reasonable inference is that
Radcliff was removed from payroll as part of a wide-scale, corporate decision.  A factfinder
cannot infer pretext from the mere fact that Beverly West had once characterized a personnel
decision as company wide as opposed to regional.  Radcliff does not challenge that the
decision was, in fact, regional.  Therefore, the court finds that Radcliff has not produced
sufficient evidence of inconsistencies and contradictions to undermine the credibility of

-14-

Beverly West's explanations.[7]

In her only other argument concerning pretext, Radcliff directs the court to the EEOC's

conclusion that there exists "reasonable cause" to believe that Radcliff was the victim of

unlawful discrimination.  Radcliff argues that this Determination alone is sufficient to establish

pretext.  (Pl's Br. at 11-12.)  The court disagrees.  While such evidence has been admissible in

bench trials, it is well within the court's discretion to exclude an EEOC determination in a jury

trial because of its potentially prejudicial effects.  *See* FED. R. EVID. 403; *Walker v.*

*NationsBank of Florida, N.A.*, 53 F.3d 1548, 1554-55 (11th Cir. 1995).  Even if the court

considers the EEOC Determination as admissible evidence, this letter alone hardly constitutes

sufficient evidence of pretext on the defendant's part.  An independent government

commission's findings are not necessarily enough to create genuine issue of material fact.  *See*

*Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988) (holding state commission's

findings did not cr\eate a genuine issue of material fact where findings simply repeat facts

---

[7]    Though not addressed in Radcliff's brief, the payment of Corey and Smith through
payroll is not an inconsistency that reasonably impeaches Beverly West's credibility.  Corey
and Smith remained on payroll due to Waycaster's noncompliance with the regional office's
directive.  (Waycaster Decl. at ¶¶ 3-6; Malone Decl. I at ¶ 3.)  Radcliff has presented no
evidence that the regional office knew of or in any way ratified Waycaster's apparent decision
to allow beauticians to remain on payroll.  The fact that Waycaster, a manager of a different
area of the state, did not comply with a corporate directive does not detract from the validity
of Beverly West's explanation.
        Also, evidence of Kathy Peters's payroll status cannot reasonably undermine the
credibility of Beverly West's proffered rationale.  As discussed above, it is undisputed that
Kathy Peters's placement and retention on payroll resulted from an internal lack of
communication at the Florence facility.  Radcliff has presented no evidence that either Gossett
or anyone at the regional office of Beverly Enterprises was aware of Peters's payroll status
between July 1993 and May 1994.  Thus, the oversight that allowed Peters to remain on
payroll hardly constitutes a "contradiction" in Beverly West's explanation.

-15-

already alleged by plaintiff) (citing *Johnson v. Yellow Freight Sys., Inc.*, 734 F.2d 1304, 1309

(8th Cir. 1984), *cert. denied*, 469 U.S. 1041 (1984) (noting the limited probative value of an

EEOC determination where jury was presented with substantial evidence as to all matters

summarized in EEOC report)).

In the present case, the EEOC used the following basis to conclude that "reasonable

cause" exists to believe Radcliff was the victim of racial discrimination:

> Documentation supplied by [Beverly West] does not show any other employee
> being converted to an independent contractor in August, 1993. [Beverly West]'s
> records show that a similarly situated White employee was not converted to
> independent contractor status until May, 1994. Therefore, [Radcliff] has
> established a prima facie case of race discrimination on the conversion.

Pl.'s Evid. Submission at Ex. 1 (EEOC Determination at 2 (Feb. 26, 1996)). Because this

Determination rests on a mere *subset* of the evidence and allegations[8] presently before the

court, the finding of "reasonable cause" carries negligible evidentiary value in support of the

plaintiff's claim.[9] In fact, as counsel for both parties agreed during oral argument, Beverly

---

[8]     The "similarly situated White employee" in the Determination presumably refers to
Kathy Peters.

[9]     While an EEOC determination may serve to highlight the availability and relevance of
evidence in a specific case, EEOC findings cannot function as a substitute for the evidence
required to maintain a civil action. The Supreme Court has noted:

> Title VII does not provide the Commission with direct powers of enforcement,
> The Commission cannot adjudicate claims or impose administrative sanctions.
> Rather, final responsibility for enforcement of Title VII is vested with federal
> courts.

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974). While the Court in *Alexander* was
noting that "[c]ourts retain . . . broad remedial powers despite a Commission finding of *no*
reasonable cause," *see id.* (emphasis added), the Court's reasoning applies with equal force to
instances where the EEOC has found reasonable cause. Thus, irrespective of the EEOC's

-16-

West has produced additional evidence concerning Peters's payroll status that was not available for the EEOC when it issued its Determination. This evidence establishes that Peters had been paid as an independent contractor until July 1993 and explains that Peters remained on payroll until May 1994 due to the legitimate, nondiscriminatory reasons of error and lack of communication. Without accounting for this newer evidence, the EEOC Determination cannot serve as evidence of pretext.

Because Radcliff has not provided sufficient evidence to rebut the defendant's proffered explanation for her conversion to independent contractor status, Beverly West is entitled to judgment as a matter of law on Radcliff's claim that this decision was motivated by race discrimination.

### 2.    *Delay or Withholding of Payments*

Radcliff also fails to establish a prima facie case of race discrimination with respect to the timing of payments for her services.[10] Even if the court assumes that Radcliff can show that the alleged delays of her payments constitute adverse employment actions, Radcliff cannot show that others outside of her protected class were treated more favorably. While the timing of Radcliff's payments is undeniably different as an independent contractor from her payments as an employee on payroll, Radcliff cannot identify a single independent contractor who was

---

Determination, the task of determining whether the evidence in this case has created a genuine issue of material fact rests solely with the court.

[10]    Radcliff bases both a retaliation claim and a retaliation claim on the alleged withholding and delaying of payments. (Compl. at ¶8.) However, she agrees that Beverly West was paying everything that it owed her. (Radcliff Dep. at 196.) Therefore, her claims only involve the timing (i.e., alleged *delays*) in payment.

-17-

treated differently in terms of the method or timing of payment. (Radcliff Dep. at 171-72.) Beverly West has presented undisputed evidence that the procedure for processing Radcliff's invoices and the timing of her payments were no different than that of other independent contractors. (Croft Decl. I at ¶ 11; Carter Decl. at ¶¶ 7-8; Holloway Dep. at 152-53.)

Assuming Radcliff could meet the burden of establishing her prima facie case of race discrimination, her claim would still fail. By explaining the method and timing of how it processes invoices submitted by independent contractors, Beverly West has articulated a legitimate, nondiscriminatory reason for any perceived delays in payment. Radcliff has neither challenged the veracity of this explanation nor presented any evidence of racially discriminatory motives.[11] In fact, Radcliff cannot specify any employee in the corporate accounts payable department — where Radcliff's invoices and paychecks are processed — who was aware of her race. (Radcliff Dep. at 184.) Once Radcliff was converted to independent contractor status, her invoices, along with the invoices of all other independent contractors, had to be forwarded to the corporate accounts payable department in Arkansas for processing. (Croft Decl. I at ¶ 2.) The length of time it takes Beverly Enterprises to process invoices is a function of the volume of invoices submitted and the company's internal mechanisms for processing them. (*See id.* at ¶¶ 2-9.) Because Radcliff has not produced any evidence

---

[11]    As with other independent contractor beauticians, Radcliff has experienced occasional delays in the processing of her invoices. For example, one of Radcliff's invoices, dated November 16, 1996, was not paid until April 4, 1996. Ample evidence exists to show that other beauticians have experienced similar delays. (*See* Croft Decl. II at Ex. A ( including vendor histories of the following white beauticians: Lorraine Richardson's Feb. 24, 1995 invoice was not paid until May 25, 1995; Mytrice Norris's Jan. 26, 1995 invoice not paid until May 4, 1995; Suzan Hawkins's March 13, 1995 invoice not paid until May 15, 1995).)

challenging Beverly West's explanation for the timing of her payments, the court is of the opinion that Beverly West's motion is due to be granted as to Radcliff's claim that defendant delayed or withheld payments due to her race.

**B.    Retaliation**

Radcliff alleges that Beverly West retaliated against her for filing an EEOC Charge in September 1993 by withholding or delaying her payments. (*See* Compl. at ¶¶ 6, 8.)  To establish a prima facie case of retaliation under Title VII, Radcliff must establish that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) the two events are causally related. *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1196 (11th Cir. 1997).  Assuming Radcliff can establish the first two elements of the prima facie case, Radcliff has not set forth sufficient evidence to establish that a causal relationship exists.

To establish a causal link between protected activities and adverse employment actions, a plaintiff must, at a minimum, demonstrate that the defendant was actually aware of the protected activity at the time of the adverse employment action. *Raney*, 120 F.3d at 1197; *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).  Radcliff has produced no evidence that either Virginia Carter, who handled accounts payable at Beverly West, or the employees at the Beverly Enterprises accounts payable department in Arkansas were aware of Radcliff's EEOC charge; these employees would be primarily responsible for any delays in Radcliff's payments. (*See* Pl.'s Evid. Submission at Ex. 3 at 3 (Def.'s Resp. to Pl.'s 2d Req. for Produc. of Docs. & Interrogs); Carter Decl. at ¶¶ 1, 8; Croft Decl. I at 10.)

-19-

Furthermore, if Radcliff actually experienced delays in payment as retaliation, the timing of her payments after the defendant learned of the charge would differ from the timing of her payments before the charge. Radcliff has produced no evidence of such disparities; she only makes the unsubstantiated allegation that "[s]omebody is holding [her] invoices." (Radcliff Dep. at 214-15.) The evidence, however, does not indicate that she experienced any undue delay in the processing of her invoices. At the initial stage of Beverly West's payment cycle, vendors submit their invoices to Virginia Carter for recordkeeping and transmission to the corporate accounts payable department in Arkansas. (Carter Decl. at ¶ 1.) For Radcliff's invoices dated before September 22, 1993,[12] Carter transmitted the invoices, on average, slightly more than seven days after the invoice date. (Carter Decl. at Ex. A.) For invoices dated September 22, 1993 through March 31, 1994, the transmission times averaged less than seven days after the invoice date. (*Id.*) It is undisputed that once Radcliff's invoices arrived in Arkansas, the accounts payable personnel, who had no knowledge of her EEOC charge, processed her invoices within the same time frame and using the same methods as that employed for other vendors' invoices. (*See* Croft Decl. I at ¶ 10, Ex. A; Radcliff Dep. at 183.) Based on the evidence submitted by both parties, a reasonable factfinder can only conclude that Radcliff's protected activities are completely unrelated to the timing of her payments.

---

[12]   Radcliff admits that she did not inform anyone of her charge. (Radcliff Dep. at 173.) She does not rebut the defendant's assertion that Jack Holloway, who learned about the charge "around" September 24, 1993, was the first person to receive notice of the charge. (Pl.'s Evid. Submission at Ex. 3 at 3 (Def.'s Resp. to Pl.'s 2d Req. for Produc. of Docs. & Interrogs); Holloway Decl. at ¶ 7.) Therefore, the court will compare invoices before September 22, 1993 with those dated September 22, 1993 through March 31, 1994.

-20-

Even if Radcliff could establish a prima facie case of retaliation, summary judgment is still appropriate because she cannot rebut Beverly West's legitimate, nondiscriminatory reason for the timing of her payments. As stated in the previous section, Beverly West has produced evidence attributing its payment cycle for Radcliff to the method it employs for processing the invoices and paychecks of all its independent contractors. This explanation satisfies Beverly West's burden of production and shifts the burden to Radcliff to show evidence of pretext. Just as she fails to rebut this proffered rationale with respect to her race discrimination claim, Radcliff again fails to challenge the veracity of this explanation. Radcliff only argues that the EEOC's Determination provides sufficient evidence of retaliation. (*See* Pl.'s Br. at 13-14.) As stated previously, this Determination alone is insufficient to establish pretext. Moreover, Radcliff has submitted no evidence demonstrating a difference in the timing of her payments once Beverly West learned about her EEOC charge. Nor does she allege that the timing of her payments was any different from the payment cycle of other beauticians. [13] Finally, Radcliff fails to challenge Beverly West's evidence demonstrating that no one in accounts payable had any knowledge of Radcliff's charge. Because no genuine issues of material fact exist, the court is of the opinion that Beverly West is entitled to judgment as a matter of law on Radcliff's retaliation claim.

---

[13] As noted above, delayed payments were experienced by other beauticians and do not create the inference of disparate treatment. *See* note 11, *supra*. Furthermore, Radcliff's delayed payments in 1995 are too remote in time to be "causally linked" to her EEOC charge and Radcliff has not produced any other evidence that would link the delays to her filing.

-21-

## IV. CONCLUSION

The court notes that Veocie Radcliff personally appeared with her counsel at two lengthy hearings where the court engaged in a detailed review of the voluminous payroll and invoice records submitted by the defendant. The court ordered submission of these records to ensure that the affidavits supporting the Motion for Summary Judgment were properly substantiated. During the two hearings, the court explained the summary judgment process to Radcliff and listened at length while she stated her convictions about her claims. Although the court recognizes that Radcliff sincerely believes that she is the victim of racial discrimination and retaliation, her beliefs are no substitute for evidence. An overwhelming amount of evidence in the record is undisputed. Taken as a whole, the evidence cannot reasonably support Radcliff's claims. Consequently, the court concludes that no genuine issue of material fact exists and Beverly West's Motion for Summary Judgment is due to be granted. Radcliff's claims will be dismissed with prejudice. An order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this 24th day of March 1998.


SHARON LOVELACE BLACKBURN
United States District Judge

-22-